Martha K. Zelman, J.
This is a proceeding by petitioners Tracy Williams and Jacquelyn Williams aged 11 years and 15 years respectively, by their natural mother and guardian, Glorida Foster, to change their surname to that of Mrs. Foster and their stepfather, George Foster. The petition is opposed by the petitioners’ natural father, Carl Williams.
Mrs. Foster and Mr. Williams were divorced in California, Mr. Williams’ domicile in 1967. Mrs. Foster resided in New York at that time and has continued to do so ever since. Petitioners and Mrs. Foster allege that Mr. Williams has had no contact with Tracy or Jacquelyn for 12 years, since the original separation. He has never called or visited the. petitioners. He has not sent birthday or Christmas gifts or cards or ever written. Indeed, he never has even seen Tracy, his younger daughter. At the time of divorce he was represented by counsel and waived all visitation rights.
For his part, Mr. Williams who submitted affidavits in lieu of a personal appearance, asserts that he remains concerned with petitioners and their welfare. He says that he would *88 have contacted petitioners had he known their present whereabouts. He claims to have made attempts to locate Mrs. Foster and petitioners. These have included contacting Mrs. Foster’s parents, who allegedly rebuffed him. Also, Mr. Williams tried, allegedly, to make contact through his sister living on Long Island, who was unable to learn Mrs. Foster’s new married name.
Mr. Williams has made regular and prompt payments for the petitioners’ support. They have been remitted through the Sacramento, California, District Attorney, under the Uniform Support of Dependents Law.
Mrs. Foster remarried shortly after the divorce. The petitioners have resided with their mother and Mr. Foster since then. Petitioners attend Catholic parochial schools.
The petitioners and their mother say that the difference in surname has caused embarrassment at the Catholic schools petitioners attend, particularly in view of Catholic teaching regarding divorce and remarriage. They state further that the situation has caused emotional upset in general. Further, petitioners state that they regard Mr. Foster, who has tried unsuccessfully to adopt them, as their father. The court has interviewed the petitioners individually and they have stated that the petition reflects their wishes.
Traditionally, the courts have held that "the father of the infant has a natural right to have his (child) bear his name unless the child’s best interests are adversely affected.” (Matter of Baldini, 17 Misc 2d 195.) Thus, in Baldini a request for a name change was denied even where the child’s natural father had no contact with him. In the past, such name changes have been granted over the father’s objections only where the father has committed a heinous or notorious crime that might stigmatize the infant (e.g., Matter of Fein, 51 Misc 2d 1012; Matter of Yessner, 61 Misc 2d 174).
In short, the traditional view has treated this as a matter of paternal rights that could be forfeited only by misconduct, including abandonment. (See Matter of Robinson, 74 Mise 2d 63.) Courts have of course refused to grant leave where the natural father was present and had a relationship with his children (Matter of Wittlin, 61 NYS2d 726) even though he had failed to support them (Matter of Simon, 1 Misc 2d 177).
However, it is important that in both Wittlin and Simon the natural father visited his children and had a regular relationship with them, even though the children lived with their *89 stepfathers. Here, of course, there is no such relationship. What contact there is is wholly financial.
However, courts have taken a more pragmatic approach recently to promote the child’s best interest where the father-child relationship has been destroyed. (Matter of Robinson, supra.) Thus, in Robinson where a father had not seen or supported his child since his divorce from the child’s mother, the change of name to that of a stepfather was granted.
In the case before this court, the father has been a stranger to his children for 12 years. In a very real way, the only father they have known has been their stepfather, Mr. Foster. Financial support paid involuntarily is not a substitute for bonds of love and affection. Although Mr. Williams professes love and concern, the court finds it inconceivable that he could not have located the children had he really wanted to. His efforts appear to have been little more than perfunctory. Indeed, his conduct since the start of these proceedings is inconsistent with his assertions. Now he unquestionably knows the petitioners’ whereabouts. Yet, he has made no effort to contact them, to secure visitation rights, or even to write. His real interest it appears is one of pride, and not parental love. The court must consider each petitioner’s "current relationship with her present family, her school and her society” (Matter of Robinson, supra, p 65). This court feels that the Baldini approach which places the father’s "natural right” above the child’s emotional needs and the reality of the child’s actual family relationships should be discarded. This question should not be treated as if it were a matter of property rights or a question of title. While the court should not hastily end a real parental relationship, it also should not force one that is dead. The real needs of the child should be paramount.
This court now finds that Mr. Foster has, in fact, if not in law or in blood, been the real father of these children. There is no relationship between the children and Mr. Williams. The court should not encourage a nonexistent relationship based on money and not actual love and concern. The court’s fundamental concern should be to allay the anxiety of petitioners and minimize emotional damage it might cause in later life.
Petitioners, Jacquelyn Williams and Tracy Williams should be permitted the emotional security and symbolic value available from the proposed name change to Jacquelyn Foster and Tracy Foster.
*90 Petition granted.